UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X

ERNESTINE RICHARDSON,

                         Plaintiff,

            v.

BRONX LEBANON HOSPITAL,

                     Defendant.

------------------------------------------------------X

| USDC SDNY |
| --- |
| DOCUMENT |
| ELECTRONICALLY FILED |
| DOC #: _____ |
| DATE FILED: <u>September 5, 2014</u> |

11 Civ. 9095 (KPF)

<u>OPINION AND ORDER</u>

KATHERINE POLK FAILLA, District Judge:

       In December 2011, Defendant Bronx Lebanon Hospital elected not to promote Plaintiff Ernestine Richardson to Director of its Utilization Case Management Department. Shortly thereafter, in February 2012, Defendant terminated Plaintiff's employment. Plaintiff initiated this lawsuit in December 2011, and filed an amended complaint in May 2012. Of particular significance here, Plaintiff alleges that Defendant's decisions not to promote her and to terminate her employment violated federal, state, and local law because those decisions were made in retaliation for Plaintiff's filing of discrimination complaints with the Equal Employment Opportunity Commission and this Court. Because Plaintiff has failed to establish a prima facie case of retaliation with respect to Defendant's failure to promote her, and because she has failed to raise a genuine issue of material fact with respect to Defendant's decision to terminate her employment, Defendant's motion for summary judgment as to both claims is granted.

# BACKGROUND[1]

## A.    Factual Background

### 1.    Plaintiff's Employment with Defendant

Defendant Bronx Lebanon Hospital ("Defendant" or "BLH") is a 965-bed voluntary, not-for-profit hospital serving the central and southern Bronx communities.  (Def. 56.1 ¶ 2).  Plaintiff, an African-American female, began working for Defendant in 1983 in its Nursing Department.  (Richardson Dep. 18, 21).  In 1988, Plaintiff moved to the Utilization Case Management ("UCM") Department as a Patient Utilization Review Coordinator.  (Def. 56.1 ¶ 3).

The UCM department is responsible for obtaining reimbursement for Defendant from payors, including federal health care plans, Medicaid, and Medicare.  (Def. 56.1 ¶ 4).  To achieve this, the UCM Department ensures that

---

[1] Rule 56.1 of the Local Civil Rules of the United States District Courts for the Southern and Eastern Districts of New York (the "Local Rules") requires a party moving for summary judgment to submit a "separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried."  Local Rule 56.1(a).  The movant's asserted facts are deemed to be admitted unless specifically controverted by the statement served by the opposing party.  Local Rule 56.1(c).  This provision is significant here, because Plaintiff responds to several of Defendant's factual assertions by noting that the only evidence offered in support is deposition testimony.  Of course, deposition testimony is admissible evidence appropriately considered under Federal Rule of Civil Procedure 56.  Moreover, noting the absence of corroborating documentation for such testimony does not, as Plaintiff appears to believe, suffice to controvert those asserted facts.

The facts in this Opinion are drawn from Defendant's Local Rule 56.1 Statement ("Def. 56.1"), and the exhibits thereto; Plaintiff's Local Rule 56.1 Counter Statement ("Pl. 56.1"), and the exhibits thereto; and Defendant's Reply to Plaintiff's Local Rule 56.1 Counter Statement ("Def. 56.1 Reply").  Citations to a party's Local Rule 56.1 Statement incorporate by reference the documents and deposition testimony cited therein.

For convenience, Defendant's opening brief will be referred to as "Def. Br."; Plaintiff's opposition as "Pl. Opp."; and Defendant's reply brief as "Def. Reply."  References to deposition transcripts will be styled as "[Name] Dep."

Defendant provides — and bills — for services in a manner that makes clear that such services are both necessary and reimbursable. (*Id.*).  UCM is also responsible for (i) ensuring that all patients are properly pre-certified for medical treatment; (ii) proactively checking with doctors to ensure that the doctors are providing the proper intensity of medical care in light of the severity of the patient's illness; and (ii) effectively planning discharge procedures to ensure that patients do not unnecessarily extend their hospital stays. (*Id.* at ¶ 5).  Failure to perform these functions can result in the denial of payment to Defendant for the services it renders. (*Id.*).

Defendant indicated that, as Assistant Director of its UCM Department, Plaintiff's responsibilities included: (i) overseeing the UCM process on a day-to-day basis; (ii) ensuring that UCM staff timely reviewed patient charts and ensured that doctors received payor authorization prior to performing necessary medical care; (iii) maintaining the UCM Department's focus on denial prevention strategies; (iv) completing UCM performance appraisals on an annual basis; and (v) maintaining direct oversight of operations for UCM. (Def. 56.1 ¶ 10).  Plaintiff agrees that she was responsible for the day-to-day running of the UCM Department, but maintains that she was not responsible for denials, which she contends fell under the purview of the UCM Director (i.e., her direct supervisor) and the Director's supervisor. (Pl. 56.1 ¶ 10).[2]

---

[2]     Plaintiff's deposition testimony undercuts that position.  Plaintiff testified that her responsibilities included, among other things, serving as a "resource manager, overseeing the daily operations of staff, clinical reviews, time and leave evaluations, meetings, projects, train[ing], meeting with doctors, [and] discharge planning"; she also

3

While employed by Defendant, Plaintiff received several promotions: in 1989, she was promoted to Utilization Pre-Admission Coordinator; in 2002, she was promoted to Appeals Manager; in 2004, she was promoted to UCM Assistant Director; and, on November 1, 2011, she was promoted to Acting UCM Director.  (Def. 56.1 ¶ 8; Pl. 56.1 ¶ 25).[3]  When Plaintiff became UCM Assistant Director in 2004, her supervisor was Evelyn Brillon; Brillon remained in that capacity until October 31, 2011, when her own employment was terminated.  (Pl. 56.1 ¶ 9).

Plaintiff served as Acting UCM Director through the end of 2011, at which time Defendant hired Phyllis McPherson to serve as UCM Director.

---

worked on any matters assigned to her by the UCM Director, including matters assigned during or because of the Director's absence.  (Richardson Dep. 35).  Richardson then spent considerable time addressing clinical reviews, or reviews undertaken to ensure that patients at the hospital meet the payor's medical necessity or other criteria for hospitalization.  (*See, e.g.*, *id.* at 56 (discussing criteria used to provide clinical reviews), 61 (noting that the job of UCM is to provide "clinical information to those carriers whose patients are in the hospital.  We have to let them know why they're in the hospital."), 62-65 (discussing payor criteria), 70-71 (discussing lack of clinical review as a basis for denial of payment), 71-72 (discussing performance of clinical reviews)).  Indeed, Plaintiff outlined her role in the clinical review process, which included "[k]nowing what the cases were," "mak[ing] sure that the cases were being given to the staff to get the review completed," and "[f]ollow[ing] up on cases."  (*Id.* at 73).  Significantly, Plaintiff conceded that deficiencies in the clinical review process represented some portion of the denials of payment to Defendant.  (*Id.* at 70-71, 77-78, 80).

Plaintiff also acknowledged participating in the discharge planning process, including participation in "discharge planning" rounds on Thursdays.  (*See, e.g.*, Richardson Dep. 41-43).  Later in her deposition, Plaintiff noted that during those rounds, one issue that would be addressed with physicians was the admission of patients who did not meet the medical necessity criteria for hospitalization, which Plaintiff identified as another basis for denials of payment.  (*Id.* at 78-80).

[3]     Plaintiff contends in opposing this motion that her appointment as Acting UCM Director was not a promotion because it was temporary.  (Pl. 56.1 ¶ 19 n.5).  At her deposition, however, Plaintiff testified that she considered her appointment to Acting Director of UCM to be a promotion.  (Richardson Dep. 289-90).

Plaintiff returned to her position as UCM Assistant Director on or around December 30, 2011, until February 17, 2012, when she was terminated from that position. (Pl. 56.1 ¶ 9; Def. 56.1 ¶ 28). Throughout this time, McPherson served as Plaintiff's supervisor. (Pl. 56.1 ¶ 9).

Defendant contends that Plaintiff received multiple salary increases and bonuses during her tenure with Defendant. (Def. 56.1 ¶ 6). Namely, in 2004, Plaintiff's salary was increased from $75,085 to $85,000; in 2007, her salary was increased to $100,000; in 2010, her salary was increased to $110,000; and between 2008 and 2010, Plaintiff received three bonus payments totaling $15,800. (*Id.*). Plaintiff counters that the purported raise to $85,000 was not in fact a raise, but a required adjustment because her starting salary of $75,085 was at an inappropriate pay grade. (Pl. 56.1 ¶ 6). Similarly, Plaintiff contends that the increase to $100,000 in 2007 was because Plaintiff was receiving the wrong salary grade. (*Id.*). Plaintiff further states that she received no salary adjustments after 2007, and that in November 2011, when she was appointed Acting UCM Director, she received a temporary salary increase to $110,000, which was reduced to $100,000 upon returning to her permanent role as Assistant UCM Director. (*Id.*).[4]

---

[4]    In connection with this motion, Plaintiff has withdrawn her claims for pay discrimination. (Pl. Opp. 1 n.1). The Court, however, must evaluate Defendant's motion for summary judgment on Plaintiff's claims for pay discrimination as unopposed. *See Klein* v. *Torrey Point Grp., LLC*, 979 F. Supp. 2d 417, 432-33 (S.D.N.Y. 2013) (construing as unopposed a summary judgment motion with respect to a claim the non-movant had "offered to withdraw"). Having reviewed Plaintiff's claims, the Court holds that they must be dismissed for the reasons set forth in Defendant's supporting memorandum. (Def. Br. 4-7). Accordingly, these claims are dismissed and will not be addressed in this Opinion. Although the facts regarding Plaintiff's salary are

### 2.     Defendant's 2010 Reorganization

By 2010, Defendant recognized that it needed to address staggering revenue losses that it was incurring because of the denial of payments. (Def. 56.1 ¶ 11). To that end, in May 2010, Defendant hired Dr. Robert Leviton to serve as Chief Medical Information Officer. (*Id.*).

Starting in or around the end of 2010, Dr. Leviton became responsible for, among other things, analyzing the UCM Department to determine whether it was operating effectively to decrease revenue loss. (Def. 56.1 ¶ 11). Ultimately, Dr. Leviton concluded that Defendant was losing substantial revenue because of unnecessary denials of payments due to the UCM Department's failure to, among other things: (i) proactively meet with doctors to ensure that they were performing their services in a timely and effective manner with payor guidelines; (ii) sufficiently review patient charts to determine whether the medical care provided met payor reimbursement guidelines; and (iii) provide payors with a clinical summary of the illnesses and proposed medical care to receive authorization for medical care. (*Id.* at ¶ 12).

By May 2011, Dr. Leviton determined that Defendant was incurring a 76% denial of payment rate, weekly denials of up to $350,000, and annual revenue losses of up to $36 million. (Def. 56.1 ¶ 14).[5] By October 31, 2011,

_____

included herein for context, that the parties dispute these facts is irrelevant to resolution of the pending motion.

[5]     Defendant contends that the losses were incurred by the UCM Department, under the leadership of Brillon and Plaintiff (Def. 56.1 ¶ 14), whereas Plaintiff contends that the

6

Dr. Leviton determined that the UCM Department needed new leadership to address its chronic and costly performance issues and revenue losses. (*Id.* at ¶ 18). As a result, Dr. Leviton terminated the employment of the UCM's Director (and Plaintiff's then-supervisor), Evelyn Brillon. (*Id.*).

### 3.    Plaintiff's April 2011 EEOC Complaint

In April 2011, while Dr. Leviton was in the midst of investigating UCM's role in the severe loss of hospital revenues, Plaintiff filed a complaint with the Equal Employment Opportunity Commission (the "EEOC"), alleging that Defendant had discriminated against her on the basis of her race and sex (the "April 2011 EEOC Complaint"). (Def. 56.1, Ex. O). In the April 2011 EEOC Complaint, Plaintiff indicated that the discrimination took the form of Defendant failing to compensate Plaintiff adequately for her job responsibilities. (*Id.*). Plaintiff alleged that she had not received a salary adjustment in six years, and that based on the research she had conducted, her salary was far below the industry standards. (*Id.*). On September 14, 2011, the EEOC informed Plaintiff that based upon its investigation, it was unable to conclude that the information obtained established a violation of relevant federal statutes. (Def. 56.1 ¶ 17 & Ex. S). At the same time, the EEOC informed Plaintiff of her right to bring suit for the claims advanced in the April 2011 Complaint in federal or state court. (*Id.*).

─────────────────────

losses were incurred by Defendant (Pl. 56.1 ¶ 14). Being that the UCM Department is part of Defendant, the Court has attributed the losses to Defendant as a whole.

Jasen Nhambiu, Director of Labor Relations at Defendant, testified that Plaintiff's April 2011 EEOC Complaint was first received by Defendant on May 6, 2011.  (Nhambiu Dep. 16).  Selena Griffin-Mahon, Assistant Vice President for Human Resources for Defendant, testified that she became aware of the EEOC Complaint in or around the summer of 2011.  (Griffin-Mahon Dep. 54).

### 4.    Defendant's Search for a New UCM Department Director

On November 1, 2011, after terminating Brillon, Defendant (specifically, Dr. Leviton) promoted Plaintiff to Acting Director of the UCM Department.  (Pl. 56.1 ¶ 19).  In that regard, Dr. Leviton met with Plaintiff to discuss her duties pending Defendant hiring a permanent UCM Director.  (Def. 56.1 ¶ 20).  Plaintiff testified as to her belief that when she was appointed Acting Director, she was going to eventually be promoted to Director of the UCM Department.  (Pl. 56.1 ¶ 21).  Plaintiff's bases for this belief were her understanding of Defendant's policy and her personal experience that her temporary appointment was a formality prior to her receiving the permanent position.  (*Id.*).[6]  Plaintiff did not, however, succeed in securing the role of permanent UCM Director.

---

[6]    Defendant's Employee Handbook states that Defendant "maintains a policy of filling new or vacant positions from within [Defendant] whenever possible, prior to recruiting individuals from outside."  (Pl. 56.1 Ex. I).

The Court notes the tension between Plaintiff's argument that she had been "groomed" for the position of UCM Director and her stated lack of involvement in any conduct while Assistant Director of UCM that resulted in denial of payments to BLH.  The latter point is addressed above in footnote 2.

On November 16, 2011, during a meeting with Dr. Leviton, Plaintiff was informed that she was not being considered for the UCM Director position because she had not submitted an application. (Pl. 56.1 ¶ 21).  Shortly thereafter, and no later than November 29, 2011, Plaintiff advised Dr. Leviton that she wished to apply for the UCM Director position, and submitted her application for consideration. (Def. 56. ¶ 21; Pl. 56.1 ¶ 21).  Despite Plaintiff seeking employment as the UCM Director, she participated in the interview process for other candidates who were applying for that position. (Pl. 56.1 ¶ 21).  Dr. Leviton advised Plaintiff of his belief that her participation in the review process would not be a conflict of interest, and his desire to have her involved in the process. (*Id.*).

Dr. Leviton considered Plaintiff for the UCM Director position, and interviewed her on December 7, 2011, for that position. (Def. 56.1 ¶ 22).  Dr. Leviton recalled during his deposition, refreshed by contemporaneous notes of the interview, that he posed a number of questions to Plaintiff about UCM and BLH personnel and policy, for which she could provide no answer. (*See* Leviton Dep. 116-64; Def. 56.1 Ex. T).  Plaintiff concedes that Dr. Leviton indicated to her and at least one other person that he was strongly considering Plaintiff to become permanent Director of UCM, but contends — at odds with the overwhelming weight of the evidence — that she was never formally interviewed by Dr. Leviton. (Pl. 56.1 ¶ 22).  That is, Plaintiff agrees that she met with Dr. Leviton on December 7, but claims that she was never informed that the

9

meeting was a job interview, and that none of the necessary paperwork was
completed by Dr. Leviton to demonstrate that an interview was conducted.
(*Id.*).

By December 12, 2011, Dr. Leviton determined that Plaintiff did not have
the operational, procedural, or institutional knowledge required for the
permanent UCM Director position.  (Def. 56.1 ¶ 23; *see also* Leviton Dep.
162-63 (Dr. Leviton recounting impressions, all negative, of Plaintiff after the
December 7 interview)).  Dr. Leviton's reasons were based on his conclusions
that Plaintiff did not, among other things: (i) know how to operate and train
UCM staff on UCM software; (ii) timely perform the required yearly UCM staff
evaluations; (iii) have familiarity with UCM data such as pending
authorizations, patient admissions, intensity of care given, length of stay, and
discharge statistics (all to ensure that services were being provided within
payor guidelines); (iv) ensure that UCM staff provided doctors with essential
services to ensure payor guidelines adherence; and (v) run daily denial of
payment reports to timely review the basis for denial and ensure that such
denials would not recur.  (Def. 56.1 ¶ 23).

Dr. Leviton's search for candidates to fill the UCM Director position
included external candidates who had experience working directly for
healthcare organizations or payors and who had firsthand experience and
knowledge of payor's reasons for denying reimbursement claims.  (Def. 56.1

10

¶¶ 24-25).[7]  According to Defendants, while conducting this search, Dr. Leviton had no knowledge of Plaintiff's April 2011 EEOC Complaint or the EEOC's September 14, 2011 decision on that claim.  (Def. 56.1 ¶ 25).[8]  Indeed, Dr. Leviton testified that he did not become aware of Plaintiff's EEOC Complaint until after Plaintiff commenced the instant litigation.  (Leviton Dep. 39-40).

On December 12, 2011, Dr. Leviton informed Plaintiff that she would not be permanently promoted to UCM Director.  (Def. 56.1 ¶ 26).  Plaintiff contends that on this day, Dr. Leviton told Plaintiff that she was not going to be considered for the UCM Director position because "upper management needed a change," and that she would not be interviewed (further or in the first instance, depending on the party) for the position.  (Pl. 56.1 ¶¶ 25-26).

---

[7]     Defendant indicates that Dr. Leviton expanded his search of external candidates for the UCM Director position in December 2011 (*see* Def. 56.1 ¶ 25), but the record demonstrates that McPherson, who was eventually hired at the UCM Director, was scheduled to be interviewed on December 2, 2011 (Pl. 56.1 Ex. Y).  For purposes of this Opinion, the Court will accept that Defendant's search for external candidates commenced in or around November 1, 2011, when Defendant terminated Brillon. Whether Defendant initiated its external search on November 1 or December 1, 2011, does not impact the decisions reached herein.

[8]     Plaintiff argues, inappropriately in her Local Rule 56.1 Statement, that the Court should discredit Dr. Leviton's testimony that he had no knowledge of the April 2011 EEOC Complaint, and that it should be up to the jury to decide whether Dr. Leviton in fact knew of that Complaint.  (Pl. 56.1 ¶ 25).  Plaintiff bases this argument on, among other things, her status as a qualified candidate; Dr. Leviton's claim that he lost all communications (including any communications that would have informed him of the EEOC Complaint) during the relevant time period when his hard drive "crashed"; and various assertions that Dr. Leviton lied at his deposition.  (*Id.*).  The record does not demonstrate that Dr. Leviton perjured himself at his deposition, and Plaintiff offers no evidence to refute Dr. Leviton's testimony.  In any event, Dr. Leviton's knowledge is legally irrelevant, inasmuch as BLH was aware of the EEOC Complaint during the relevant time period.  *See infra* at 26-27.

### 5.     Plaintiff Initiates the Instant Litigation

The day after Dr. Leviton informed Plaintiff that she would not be hired as the permanent UCM Director, she initiated the instant litigation.  Initially, Plaintiff brought claims for race and sex discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17, the New York State Human Rights Law, N.Y. Exec. Law §§ 290 to 301 (the "NYSHRL"), and the New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-101 to 8-131 (the "NYCHRL").  (Dkt. #1).

Dr. Leviton testified that he did not become aware of Plaintiff's lawsuit until in or around January 2013.  (*See* Leviton Dep. 196-98).  Jasen Nhambiu testified that he first learned of this action on or around January 12, 2012, when Defendant's Risk Management Department sent Nhambiu a copy of the Complaint.  (Nhambiu Dep. 26).  Selena Griffin-Mahon testified that she learned of the lawsuit in February 14, 2012, from Nhambiu.  (*See* Griffin-Mahon Dep. 84-86).[9]

### 6.     Defendant Hires a New UCM Director and Terminates Plaintiff's Employment

On December 30, 2011, Dr. Leviton hired Phyllis McPherson as the new UCM Director.  (Def. 56.1 ¶ 28).  McPherson, a black female, had 17 years of UCM payor-side experience, a Master's Degree in Nursing Administration, and

---

[9]     According to Nhambiu, he was notified upon receipt of the Summons and Complaint by BLH's Risk Management Department.  (Nhambiu Dep. 25).  He then informed Griffin-Mahon.  (*Id.* at 28).  In that conversation, Griffin mistakenly informed Nhambiu that she was already aware of the lawsuit, believing that Nhambiu was informing Griffin of Plaintiff's April 2011 EEOC Complaint.  (*Id.* at 45-46).

30 years of nursing experience; she also had experiential knowledge and ability

to discuss in detail the various intricacies of managing reimbursement denials

across the spectrum of healthcare plans.  (*Id.*).  On that score, Dr. Leviton

testified:

> [McPherson] was warm.  She was friendly.  She was engaging.  She
> was embracing.  She seemed like a true leader.  She had a way of
> working with the staff that was apparent from the first time I met
> her.  Her personality was lively…. She came from the payor side,
> and I really liked the fact that she had worked on the payor side,
> and I thought it would bring a new opportunity for the hospital to
> learn how payors approach denials and appeals.  I thought her
> knowledge coming from the outside of the hospital system was
> going to offer us an advantage for winning our case for building
> stronger appeals letters as she was working on the other side of
> the whole process.

(Leviton Dep. 86-87).[10]

McPherson began her job at UCM Director on January 3, 2012.

(McPherson Dep. 37).  Consequently, at that time, Plaintiff returned to her

prior position as Assistant Director, and her salary was reduced accordingly.

(Pl. 56.1 ¶ 6).

By February 2012, McPherson had observed that Plaintiff failed to:

(i) properly train UCM staff on the relevant software program; (ii) ensure that

UCM staff were coordinating payor guidelines with doctors; (iii) timely conduct

---

[10]   While not arguing that McPherson was unqualified to be UCM Director, Plaintiff
challenges McPherson's background, stating that she does not have over 30 years of
nursing experience and never worked for a hospital in the New York Metropolitan area,
that her most recent position at a hospital was in 1994 as a discharge planner in
Alabama, and that she had no experience either as a Director or Assistant Director of a
hospital UCM department or with the particular software the Defendant used.  (Pl. 56.1
¶ 28).  The Court finds that McPherson's resume establishes that her experience is
commensurate with the position for which she was hired.  (Def. 56.1, Ex. Y).

yearly performance reviews for a significant portion of UCM staff; (iv) conduct

in-person patient reviews for discharge planning; (v) obtain authorization from

McPherson prior to submitting reports to other hospital center departments;

(vi) possess adequate knowledge regarding a certain hospital software and deal

with problems related to same; (vii) act appropriately with Dr. Leviton[11];

(viii) conduct performance evaluations with McPherson's participation; and

(ix) act within the table of authority.  (Def. 56.1 ¶ 30).  McPherson concluded

that she and Plaintiff

> were not on the same road to meeting [the UCM Department's]
> goals.  [Plaintiff] was not buying into the new changes, and I felt as
> though perhaps we needed to look at placing her in another
> position where she might flourish because she was not on path
> with where we were going and was not supportive.

(McPherson Dep. 94).

One episode in particular epitomized for McPherson Plaintiff's

unwillingness to move forward.  On February 10, 2012, without clearing the

matter with McPherson or Dr. Leviton, Plaintiff sent an email to various senior

administrators at BLH — including its Chief Executive Officer, Director of

Patient Finance, Chief Financial Officer, and Chief Medical Officer — attaching

voluminous information about utilization management activity from September

2011 through January 2012.  (McPherson Dep. 102-10).  Much of this

information related to denials of payment, and none of it was accompanied by

---

[11]     Both McPherson and Leviton recalled at least one encounter in which Plaintiff was
aggressive and/or threatening towards Leviton.  (McPherson Dep. 91-92; Leviton
Dep. 202-08).

explanation of the attachments or of utilization management generally.  Among other things, Plaintiff advised the recipients of the e-mail that because of the implementation of a new software management system, known as Allscripts, the attached information, at times, did not accurately reflect actual approvals or denials of payments.  (*Id.* at 109).

According to McPherson, Plaintiff's email troubled her, first, because the information contained in it was erroneous and/or lacked context, and second, because she believed it sought to paint her (McPherson) as incompetent for conduct that predated her employment.  (McPherson Dep. 102, 104-08). McPherson discussed the e-mail shortly after its transmission with Dr. Leviton, who was as astounded as she that it had been sent.  (*See* McPherson Dep. 111-12; Leviton Dep. 211-20).  McPherson then met with Plaintiff to express her dismay about the unauthorized and misleading communication with senior BLH management.  (McPherson Dep. 112-13).[12]

McPherson testified that in or around February 12, 2012, she decided to recommend that Plaintiff's employment be terminated.  (McPherson Dep. 116; Def. 56.1 ¶ 31).  McPherson further testified that at the time she made this decision she "reviewed all the files, all the documentation that [she] had, the conversations that [she] had previously had with [Plaintiff], and felt at that time

---

[12]    According to McPherson, Plaintiff justified the email by noting that "she [Plaintiff] wanted everybody to know that things were unfair and that things were happening in the [UCM] department."  (McPherson Dep. 113).  For her part, Plaintiff testified that she sent the email without prior authorization because she wanted Dr. Leviton "to be held accountable" for any criticisms he had made about Plaintiff's work in UCM. (Richardson Dep. 338).

that [they] were not in sync and that [she] did not trust [Plaintiff] to be forthcoming." (McPherson Dep. 115).[13]

On February 16, 2012, McPherson informed Dr. Leviton of her recommendation to terminate Plaintiff. (Def. 56.1 ¶ 32). Dr. Leviton informed McPherson that the UCM was her department and he would support her reorganizational efforts. (*Id.*). Thereafter, McPherson informed Defendant's Human Resources Department of the decision to terminate Plaintiff. (*Id.*). It was at this time, Defendant contends, that McPherson was informed that Plaintiff had filed the present lawsuit, but she was also advised that it would have no bearing on the termination decision. (Def. 56.1 ¶ 33).

On February 17, 2012, Plaintiff was terminated as Assistant Director. (Def. 56.1 ¶ 34). Defendant maintains that Plaintiff was terminated as part of the ongoing reorganization effort of the UCM Department. (*Id.*). Plaintiff's termination letter stated:

> As you know the Utilization Department is undergoing a re-design to improve our performance and minimize the number of denials related to medical necessity. We are striving to effectively reduce the number of medically unnecessary admissions and improve our discharge planning efforts. This process has included a review of employee roles as determined by department needs. After such a review it has been determined that your services are no longer required effective today February 17, 2012.

---

[13]     Defendant maintains that McPherson had no knowledge of Plaintiff's EEOC Complaint (or its dismissal) or of her December 2011 filing of the instant litigation at the time she decided to terminate Plaintiff. (*See* Def. 56.1 ¶ 31). Plaintiff, however, testified that McPherson told her on or about January 20, 2012, that she was already aware of the instant litigation from Dr. Leviton. (Richardson Dep. 185-86). Since Defendant BLH was aware of both events, the timing of McPherson's knowledge is relevant only to the existence of a causal connection between the filing of the litigation and Plaintiff's dismissal, a question on which the Court finds in Plaintiff's favor. *See infra* at 33-35.

(Pl. 56.1 Ex. A).

On May 7, 2012, Plaintiff began employment with Montefiore Medical Center as a Clinical Documentation Improvement Coordinator earning around $95,000 annually.  (Def. 56.1 ¶ 35).

### 7.    Defendant Hires a New UCM Assistant Director

On April 23, 2012, Defendant hired Valarie Brockington, a black female, as UCM Assistant Director.  (Def. 56.1 ¶ 34 & Ex. BB).  Brockington has, among other things, a Juris Doctorate degree from Touro College, a Bachelor of Science Degree in Nursing from City College of New York, prior work experience with McPherson, and certifications as a Case Manager, Litigation Nurse, Law Clerk, and Occupational Health Consultant.  (*Id.*).  Plaintiff does not dispute Brockington's experience.  (*See* Pl. 56.1 ¶ 34).

## B.    Procedural History

Plaintiff commenced this litigation on December 13, 2011, bringing claims pursuant to Title VII, the NYSHRL, and the NYCHRL, and alleging that Defendant discriminated against Plaintiff based on her race and sex in that she was being paid less than similarly situated non-African American females. (Dkt. #1).  The case was assigned to the Honorable George B. Daniels, United States District Judge for the Southern District of New York.  Defendant was served on January 12, 2012.  (Dkt. #3).

On March 12, 2012, Defendant moved to dismiss the complaint. (Dkt. #10).  On May 15, 2012, Plaintiff requested leave to file an amended

17

complaint. (Dkt. #14). Plaintiff explained that she had received a right to sue letter from the EEOC regarding her charge of discrimination claiming retaliation against Defendant, and intended to include those claims of retaliation in her amended complaint. (*Id.*). Plaintiff also informed the Court that she had been advised that Defendant's counsel intended to withdraw its motion to dismiss the complaint. (*Id.*). By order dated May 17, 2012, Judge Daniels granted Plaintiff leave to file an amended complaint (*id.*), which was filed on May 25, 2012 (Dkt. #15).

In the Amended Complaint, Plaintiff alleges that in addition to her April 2011 EEOC Complaint, she filed a second charge with the EEOC on April 13, 2012, claiming that Defendant had retaliated against her for bringing the April 2011 EEOC Complaint and commencing the instant litigation. (Dkt. #15). Plaintiff alleged that Defendant did not promote Plaintiff because she had brought the April 2011 EEOC Complaint, and that she was wrongfully terminated shortly after (and because) she filed this litigation. (*Id.*). Plaintiff repleaded the causes of action advanced in her initial complaint, and filed additional claims for retaliation under Title VII, the NYSHRL, and the NYCHRL for failure to promote and retaliatory termination. (*Id.*).

On June 20, 2013, this case was reassigned to the undersigned. (Dkt. #27). After completing discovery, the Court held a conference to discuss Defendant's anticipated motion for summary judgment, and subsequently entered a briefing schedule on that motion. Defendant filed its motion for

summary judgment on December 20, 2013 (Dkt. #42); Plaintiff submitted her opposition on February 3, 2014 (Dkt. #50); and the motion was fully submitted when Defendant submitted its reply on February 28, 2014 (Dkt. #54).

**DISCUSSION**

**A.    Applicable Law**

**1.    Summary Judgment Generally**

Under Federal Rule of Civil Procedure 56(c), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *See Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322-23 (1986); *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323.  A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Jeffreys* v. *City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*). The movant may discharge this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *see also Selevan* v. *N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (finding summary judgment

19

appropriate where the non-moving party fails to "come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on an essential element of a claim" (internal quotation marks omitted)).

If the moving party meets this burden, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial" using affidavits or otherwise, and cannot rely on the "mere allegations or denials" contained in the pleadings. *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323-24; *Wright* v. *Goord*, 554 F.3d 255, 266 (2d Cir. 2009). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," *Knight* v. *U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986) (citing *Quarles* v. *Gen. Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985)).

The Second Circuit "has repeatedly emphasized the need for caution about granting summary judgment to an employer in a discrimination case where … the merits turn on a dispute as to the employer's intent." *Gorzynski* v. *JetBlue Airways Corp.*, 596 F.3d 93, 101 (2d Cir. 2010) (internal quotation marks omitted). "Because direct evidence of an employer's discriminatory intent will rarely be found, affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show

20

discrimination." *Schwapp* v. *Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997)

(internal quotation marks omitted); *see also Holcomb* v. *Iona Coll.*, 521 F.3d

130, 137 (2d Cir. 2008) ("Where an employer has acted with discriminatory

intent, direct evidence of that intent will only rarely be available, so that

affidavits and depositions must be carefully scrutinized for circumstantial proof

which, if believed, would show discrimination." (internal quotation marks

omitted)).  "Even in the discrimination context, however, a plaintiff must

provide more than conclusory allegations to resist a motion for summary

judgment, and show more than 'some metaphysical doubt as to the material

facts.'" *Gorzynski*, 596 F.3d at 101 (quoting *Matsushita*, 475 U.S. at 586)

(internal citation omitted).

### 2.    Retaliation Claims Under Title VII, the NYSHRL, and the NYCRHL

Title VII's anti-retaliation provision makes it "an unlawful employment

practice for an employer to discriminate against any of his employees …

because [the employee] has opposed any practice made an unlawful

employment practice by [Title VII]."  42 U.S.C. 2000e-3(a).  Under New York

law, it is unlawful for any employer "to discharge, expel or otherwise

discriminate against any person because he or she has opposed [unlawful

discriminatory practices] or because he or she has filed a complaint, testified or

assisted in any proceeding" relating to an unlawful discriminatory practice.

N.Y. Exec. Law § 296(1)(e).  "The NYCHRL makes it an 'unlawful discriminatory

practice' for an employer to 'retaliate or discriminate in any manner' on the

21

basis of an employee's complaints about unlawful discrimination." *Fattoruso* v. *Hilton Grand Vacations Co.*, 525 F. App'x 26, 27 (2d Cir. 2013) (summary order) (quoting N.Y.C. Admin. Code §§ 8–107(1)(a), (7)).

Plaintiff's claims for retaliation under Title VII and the NYSHRL are subject to the burden-shifting framework established in *McDonnell Douglas Corp.* v. *Green*, 411 U.S. 792, 802-04 (1973).  *See Lugo* v. *City of New York*, 518 F. App'x 28, 29 (2d Cir. 2013) (summary order) ("Discrimination claims under Title VII and the NYSHRL are governed by the burden shifting framework laid out in *McDonnell Douglas.*"); *Fincher* v. *Depository Trust and Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010) (noting that claims under Title VII are subject to the *McDonnell Douglas* three-step burden-shifting analysis); *Weinstock* v. *Columbia Univ.*, 224 F.3d 33, 42 n.1 (2d Cir. 2000) (noting that the *McDonnell Douglas* three-part burden shifting framework applies to discrimination claims brought under the NYSHRL).  Under the *McDonnell Douglas* analysis, once a plaintiff makes out a prima facie case of retaliation, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action.  411 U.S. at 802-03.  If the defendant meets its burden of establishing such a reason, the plaintiff must establish that the defendant's reason is merely a pretext for retaliation.  *Id.* at 804; *see also Holcomb* v. *Iona Coll.*, 521 F.3d 130, 138 (2d Cir. 2008); *see generally Zann Kwan* v. *Andalex Grp. LLC*, 737 F.3d 834, 842-44 (2d Cir. 2013) ("*Kwan*").

To establish a prima facie case of retaliation under Title VII, "a plaintiff must demonstrate that [i] she engaged in protected activity; [ii] the employer was aware of that activity; [iii] the employee suffered a materially adverse action; and [iv] there was a causal connection between the protected activity and that adverse action." *Kelly* v. *Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10, 14 (2d Cir. 2013) (internal quotation marks omitted). "The standard[] for evaluating … [a] retaliation claim[ is] identical under Title VII and the NYSHRL." *Id.* "[A] plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. and Santa Fe Ry. Co.* v. *White*, 548 U.S. 53, 68 (2006) (internal quotation marks omitted).

As the Supreme Court made clear in *Burlington*, Title VII "protects an individual not from all retaliation, but from retaliation that produces an injury or harm." 548 U.S. at 67. By contrast, "[a]ctions that are 'trivial harms' — i.e., 'those petty slights or minor annoyances that often take place at work and that all employees experience' — are not materially adverse." *Tepperwien* v. *Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 568 (2d Cir. 2011) (quoting *Burlington*, 548 U.S. at 68). As the Second Circuit explained:

> Material adversity is to be determined objectively, based on the reactions of a reasonable employee. "Context matters," as some actions take on more or less significance depending on the context. Alleged acts of retaliation must be evaluated both separately and in the aggregate, as even trivial acts may take on greater significance when they are viewed as part of a larger course of conduct.

23

*Id.* (quoting *Burlington*, 548 U.S. at 69) (internal citations omitted).

Retaliation claims under the NYCHRL cover a broader range of conduct. "[T]o prevail on a retaliation claim under the NYCHRL, the plaintiff must show that she took an action opposing her employer's discrimination, and that, as a result, the employer engaged in conduct that was reasonably likely to deter a person from engaging in such action."  *Mihalik* v. *Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 112 (2d Cir. 2013) (internal citation omitted).  The Second Circuit has instructed, however, that "the NYCHRL is not a general civility code, and a defendant is not liable if the plaintiff fails to prove the conduct is caused at least in part by … retaliatory motives, or if the defendant proves the conduct was nothing more than 'petty slights or trivial inconveniences.'"  *Id.* at 113 (internal citation omitted) (quoting *Williams* v. *N.Y.C. Hous. Auth.*, 872 A.D.3d 62, 80 (1st Dep't 2009)).

"[C]ourts have continued to employ the familiar burden-shifting analysis of *McDonnell Douglas*" to claims brought under the NYCHRL.  *Kerman-Mastour* v. *Fin. Indus. Regulatory Auth., Inc.*, 814 F. Supp. 2d 355, 366 (S.D.N.Y. 2011) (internal citations omitted); *but cf. Mihalik*, 715 F.3d at 110 n.8 ("It is unclear whether, and to what extent, the *McDonnell Douglas* burden-shifting analysis has been modified for NYCHRL claims.").  The salient difference is that "[w]hile the *McDonnell Douglas* burden-shifting framework still applies, at the final step the plaintiff has a 'lesser burden of raising an issue as to whether the action was motivated at least in part by discrimination or, stated otherwise, was more

24

likely than not based in whole or in part on discrimination.'"  *White* v. *Pacifica Found.*, 973 F. Supp. 2d 363, 379 (S.D.N.Y. 2013) (quoting *Melman* v. *Montefiore Med. Ctr.*, 98 A.D.3d 107, 128 (1st Dep't 2012)).  As the Second Circuit has explained,

> the plaintiff need only show that her employer treated her less well, at least in part for a discriminatory reason. The employer may present evidence of its legitimate, non-discriminatory motives to show the conduct was not caused by discrimination, but it is entitled to summary judgment on this basis only if the record establishes as a matter of law that discrimination played no role in its actions.

*Mihalik*, 715 F.3d at 110 n.8 (alteration and internal quotation marks omitted).

## B.    Analysis

### 1.    Plaintiff Fails to Establish a Prima Facie Case for Retaliation for Failure to Promote

#### a.    Plaintiff's Claims Under Title VII and the NYSHRL

Having withdrawn her claims for pay discrimination, Plaintiff is left with two claims of retaliation.  First, Plaintiff argues that she was retaliated against for filing her April 2011 EEOC Complaint when Defendant failed to promote Plaintiff permanently to Director of the UCM Department.  (Pl. Opp. 1).  Plaintiff claims that she was more qualified than her replacement and that Defendant's policy is to promote from within BHL, as opposed to hiring externally.  (*Id.*).

Plaintiff has satisfied the first and third requirements of her prima facie case.  Her filing of the April 2011 EEOC Complaint is "protected activity," *see Raniola* v. *Bratton*, 243 F.3d 610, 624 (2d Cir. 2001) ("[T]he district court tacitly agreed that [the plaintiff's] filing of an EEOC complaint ... was a protected

activity."), and Plaintiff has suffered a materially adverse employment action in that she was not promoted to UCM Director, *see Treglia* v. *Town of Manlius*, 313 F.3d 713, 720 (2d Cir. 2002) ("[D]iscriminatory failure to promote falls within the core activities encompassed by the term 'adverse actions.'").[14]

Moving to the second element — whether the employer was aware of the protected activity — Defendant contends that the record establishes that the decisionmaker, Dr. Leviton, was not aware of Plaintiff's April 2011 EEOC Complaint at the time he decided not to promote Plaintiff in December 2011. (Def. Br. 11). Plaintiff contends that the knowledge requirement is established if the legal entity (i.e., Defendant) was on notice of the protected activity. (Pl. Opp. 26). Plaintiff is correct.

In *Gordon* v. *New York City Board of Education*, the Second Circuit recognized, "Neither this nor any other circuit has ever held that, to satisfy the knowledge requirement, anything more is necessary than general corporate knowledge that the plaintiff has engaged in a protected activity." 232 F.3d 111, 116 (2d Cir. 2000). It continues to enforce this rule. *See, e.g., Summa*, 708 F.3d at 125-26 ("Nothing 'more is necessary than general corporate knowledge that the plaintiff has engaged in protected activity.'" (quoting *Gordon*, 232 F.3d at 116)); *Henry* v. *Wyeth Pharm., Inc.*, 616 F.3d 134, 147-48 (2d Cir. 2010).

---

[14]    The fact that Plaintiff has abandoned the claims set forth in her April 2011 EEOC Complaint is irrelevant. "To establish that she engaged in protected activity, [Richardson] 'need not establish that the conduct she opposed was actually a violation of Title VII, but only that she possessed a good faith, reasonable belief that the underlying employment practice was unlawful under that statute.'" *Summa* v. *Hofstra Univ.*, 708 F.3d 115, 125-26 (2d Cir. 2013) (quoting *Galdieri-Ambrosini* v. *Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 292 (2d Cir.1998)).

The law is clear, therefore, that Dr. Leviton does not need to have had knowledge of Plaintiff's April 2011 EEOC Complaint at the time he decided not to promote her in order for the second element of Plaintiff's prima facie case to be established.  What is relevant, and what is established by the record, is that by May 6, 2011, Defendant received a copy of the April 2011 EEOC Complaint (Nhambiu Dep. 16), and that this occurred prior to the decision to not promote Plaintiff to UCM Director on or about December 12, 2011.  Plaintiff has thus established the third requirement of her prima facie case of retaliation.

Turning to the final element — demonstration of a causal connection between the protected activity and the adverse action — the Court holds that, drawing all permissible factual inferences in Plaintiff's favor, she has failed to meet this burden.

The requisite causal connection may be established in two ways: "[i] indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or [ii] directly, through evidence of retaliatory animus directed against the plaintiff by the defendant."  *Hicks* v. *Baines*, 593 F.3d 159, 170 (2d Cir. 2010) (citing *Gordon*, 232 F.3d at 117).  Plaintiff does not contend that there is any direct evidence of retaliatory animus, but argues that the causal connection is established by the temporal proximity of the protected activity and the adverse

27

action.  (Pl. Opp. 17).  Put simply, the temporal proximity here does not establish the required causal connection.

As a preliminary matter, Plaintiff suggests that the relevant time period for establishing the causal connection is that between September 14, 2011, when the EEOC issued its Right to Sue Letter, and October 31, 2011, when Brillon was terminated.  (Pl. Opp. 18).  Plaintiff provides no authority to support this position, and the Court is aware of none.  The protected activity, as the Court has already found, was Plaintiff's filing of her April 2011 EEOC Complaint.  The adverse action against which this starting point is measured is the one involving Plaintiff, namely, Defendant's decision to not promote Plaintiff to UCM Director on December 12, 2011.  The date of Brillon's termination cannot be used to mark any adverse employment action.  Indeed, it was at this time that Plaintiff was appointed to Acting UCM Director, the opposite of an adverse action.  On this record, approximately seven months passed between the protected activity and Defendant's alleged retaliation.

The Second Circuit has "not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship." *Espinal* v. *Goord*, 558 F.3d 119, 129 (2d Cir. 2009) (internal quotation mark omitted); *accord Abrams* v. *Dep't of Pub. Safety*, — F.3d —, No. 13-111-cv, 2014 WL 4191178, at *8 (2d Cir. Aug. 26, 2014).  In the absence of a bright-line rule, a court must "exercise its judgment about the permissible inferences that can be drawn from temporal proximity in the context of

28

particular cases." *Espinal*, 558 F.3d at 129.  At the same time, the Second Circuit has found that "where the protected activity took place two months prior to the alleged adverse action, and where there is nothing other than that temporal proximity invoked to establish a retaliatory intent, the causal relationship is not established." *Stoddard* v. *Eastman Kodak Co.*, 309 F. App'x 475, 480 (2d Cir. 2009) (summary order); *see also Doner-Hedrick* v. *N.Y. Inst. of Tech.*, 874 F. Supp. 2d 227, 246 (S.D.N.Y. 2012) ("In general, periods greater than two months defeat an inference of causation."); *cf. Cifra* v. *G.E. Co.*, 252 F.3d 205, 217 (2d Cir. 2001) ("[W]e [have] held that it was error to grant summary judgment dismissing the plaintiff's retaliation claim for lack of evidence of a causal connection where her discharge came less than two months after she filed a complaint with [defendant's] management and just ten days after she filed a complaint with the [state division of human rights.]" (some alterations in original) (internal quotation marks omitted)); *see generally Clark Cnty. Sch. Dist.* v. *Breeden*, 532 U.S. 268, 273-74 (2001) (collecting cases and noting that for temporal proximity alone to establish a prima facie case of retaliation, the time between the protected activity and the adverse employment activity must be "very close").  The gap of approximately seven months between Plaintiff's filing of her EEOC Complaint in April 2011 and Defendant's decision not to promote Plaintiff to UCM Director in December 2011, along with the absence of any evidence suggesting a causal connection between the protected

activity and the adverse employment action, makes clear that Plaintiff cannot establish the fourth element of her retaliation claim for failure to promote.

The absence of any causal connection is particularly strong on this record, which contains additional facts negating any retaliatory inference. For starters, there is no evidence that Dr. Leviton, the primary decisionmaker, knew that Plaintiff had filed a claim with the EEOC. Although this was irrelevant to Plaintiff's establishment of the third element, its absence does negate an inference of a causal connection for the fourth requirement of Plaintiff's prima facie case. *See, e.g., Seivright* v. *Montefiore Med. Ctr., Hosp. of the Albert Einstein Coll. of Med.*, No. 11 Civ. 8934 (AJN), 2014 WL 896744, at *11 (S.D.N.Y. Mar. 3, 2014) ("Although the Second Circuit has made clear that it is not necessary that particular individuals know of the protected activities at issue to satisfy the second element of the retaliation analysis, it is equally clear that such lack of knowledge by decision-makers undercuts a claim of a causal connection." (internal citations omitted)); *see also Gordon*, 232 F.3d at 117 ("The lack of knowledge on the part of particular *individual agents* is admissible as some evidence of a lack of causal connection, countering plaintiff's circumstantial evidence of proximity or disparate treatment." (emphasis in original)); *Sundaram* v. *Brookhaven Nat'l Labs.*, 424 F. Supp. 2d 545, 584 (E.D.N.Y. 2006) ("In short, the plaintiff has failed to establish a prima facie case of retaliation because there is no evidence that any of the decisionmakers was aware of the plaintiff's protected activity and thus no evidence of a causal

connection between the protected activity and the defendant's hiring decision."). Perhaps more importantly, between the filing of the April 2011 EEOC Complaint and the alleged adverse action Plaintiff was appointed Acting UCM Director, for which she received a $10,000 raise. This further underscores the absence of any causal connection. *Cf. Dayes* v. *Pace Univ.*, 2 F. App'x 204, 208 (2d Cir. 2001) (summary order) ("As the District Court correctly concluded, the inordinate amount of time between [the plaintiff's] complaint about [the supervisor's] conduct and his negative review, especially given his intervening positive review, defeats [the plaintiff's] attempt to establish a causal connection between the two events."). Accordingly, because Plaintiff has failed to establish a prima facie case of retaliation by failure to promote under Title VII and the NYSHRL, those claims must be dismissed.

### b.    Plaintiff's Claim Under the NYCHRL

The requirements for establishing a prima facie case for retaliation under the NYCHRL differ in that the Plaintiff need not prove any adverse employment action, but rather "must show that she took an action opposing her employer's discrimination, and that, as a result, the employer engaged in conduct that was reasonably likely to deter a person from engaging in such action." *Mihalik*, 715 F.3d at 112 (internal citations omitted); *see also Fincher* v. *Depository Trust & Clearing Corp.*, 604 F.3d 712, 723 (2d Cir. 2012). Even with this lesser burden, Plaintiff fails to demonstrate the elements of her retaliation claims for failure to promote, based on the absence of evidence of any causal connection

between her filing of the April 2011 EEOC Complaint and Defendant's determination not to promote Plaintiff to UCM Director.  *See, e.g.*, *Dixon* v. *Int'l Fed'n of Accountants*, 416 F. App'x 107, 110 n.1 (2d Cir. 2011) (summary order) ("We acknowledge that the standard governing retaliation claims under the NYCHRL is different (and broader) than that applicable [to] claims under federal and state law.  Nevertheless, we find that, like her federal and state claims, [the plaintiff's] retaliation claim under the NYCHRL fails as a matter of law because she did not produce any admissible evidence to demonstrate a causal connection between her protected activity and any allegedly adverse action." (internal citation omitted)); *Shih* v. *JPMorgan Chase Bank, N.A.*, No. 10 Civ. 9020 (JGK), 2013 WL 842716, at *9 (S.D.N.Y. Mar. 7, 2013) ("Even applying the NYCHRL standard, however, the plaintiff's retaliation claim under the NYCHRL suffers from the same defects as her retaliation claims under Title VII … and the NYSHRL.  Simply put, the plaintiff has failed to set forth a prima facie case of retaliation because she failed to present evidence demonstrating a causal connection between the protected activity and any of the allegedly adverse actions.").

Accordingly, Plaintiff's claim under the NYCHRL is likewise dismissed, and Defendant is entitled to summary judgment on the claim for failure to promote.[15]

---

[15]   Because the Court holds that Plaintiff fails to establish a prima facie case for retaliation for failure to promote, it need not continue with the *McDonnell Douglas* burden-shifting analysis.

2.   **Plaintiff's Retaliation Claims Under Title VII, the NYSHRL, and the NYCRHL Relating to Her Termination Fail as a Matter of Law**

Plaintiff also argues that Defendant's also retaliated against her for filing the instant lawsuit by terminating her employment.  (Pl. Opp. 2).  As with Plaintiff's claim for failure to promote, in order to establish a prima facie case for retaliatory termination, Plaintiff must demonstrate that "[i] she engaged in protected activity; [ii] the employer was aware of that activity; [iii] the employee suffered a materially adverse action; and [iv] there was a causal connection between the protected activity and that adverse action."  *Kelly*, 716 F.3d at 14 (internal quotation marks omitted).

> a.   **Plaintiff's Claims Under Title VII and the NYSHRL**

> 1.   **Plaintiff Has Demonstrated a Prima Facie Case**

Elements one and three are satisfied by the record.  Plaintiff's filing of the instant litigation is protected activity, *Kotcher* v. *Rosa and Sullivan Appliance Ctr., Inc.*, 957 F.2d 59, 65 (2d Cir. 1992) ("[P]rotected activity usually takes the form of … filing a lawsuit."), and Plaintiff's termination is a materially adverse employment action, *Sanders* v. *N.Y.C. Human Res. Admin.*, 361 F.3d 749, 755 (2d Cir. 2004) ("Examples of [a materially adverse] change include termination of employment." (internal quotation mark omitted)).

Similar to its arguments with respect to Plaintiff's failure to promote claim, Defendant asserts that Plaintiff fails to establish the second and fourth elements because Leviton and McPherson did not know of the instant litigation

33

at the time the decision was made to terminate Plaintiff's employment, and

because the time between Plaintiff's filing the lawsuit and her termination is

"too attenuated to establish temporal proximity." (Def. Br. 11). Defendant's

knowledge argument is rejected for the same reason as before — general

corporate knowledge that the plaintiff has engaged in a protected activity is

sufficient. *Gordon*, 232 F.3d at 116. Nhambiu testified that he first knew of

the instant suit on or around January 12, 2012 (Nhambiu Dep. 16), thereby

establishing corporate knowledge prior to the decision to terminate Plaintiff's

employment on or around February 10, 2012, and prior to the actual

termination of Plaintiff's employment on February 17, 2012.

Plaintiff has also established the necessary causal connection. Plaintiff

again does not cite any retaliatory animus directed at her by Defendant, but

rather focuses on the temporal proximity between the filing of her lawsuit and

her termination. (Pl. Opp. 18-19). In particular, Plaintiff notes that: (i) she

filed this action on December 13, 2011; (ii) Defendant had notice of the action

on January 12, 2012; (iii) the decision to terminate Plaintiff was made on or

around February 12, 2012; and (iv) Plaintiff was terminated on February 17,

2012. While it is correct that just over two months elapsed between

commencement of this action and Plaintiff's termination, the Court must

"exercise its judgment about the permissible inferences that can be drawn from

temporal proximity in the context of particular cases." *Goord*, 558 F.3d at 129;

*see also Abrams*, 2014 WL 4191178, at *8 ("While 'temporal proximity must be

34

very close,' there is no 'bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action[.]'" (citations omitted)).

Moreover, an issue of fact exists concerning whether McPherson knew of this action when she decided to terminate Plaintiff. Plaintiff contends that McPherson informed her on or about January 20, 2012, that McPherson knew of the lawsuit. (Richardson Dep. 185-86). Defendant contends that McPherson did not know of the lawsuit when she decided to terminate Plaintiff. (See Def. 56.1 ¶ 31). It is not disputed, however, that McPherson knew of the lawsuit when Plaintiff's employment was terminated on February 17, 2012, allowing the inference of a causal connection between this case and Plaintiff's termination. *Cf. Gordon*, 232 F.3d at 117 ("The lack of knowledge on the part of particular [decision makers] is admissible as some evidence of a lack of causal connection."). This is not a case, therefore, where the protected activity and the adverse action are more than two months apart and where the plaintiff relies solely on temporal proximity. *See Ibraheem* v. *Wackenhut Servs., Inc.*, — F. Supp. 2d —, No. 09 Civ. 5335 (PKC), 2014 WL 1873393, at *11 (E.D.N.Y. May 9, 2014) ("This relatively short period of approximately two months is within the time period the Second Circuit has found sufficient to support an inference of retaliation."). Plaintiff has therefore established a prima facie case for retaliation for her termination subsequent to filing this action.

35

### 2.    Defendant Has Proffered a Non-Discriminatory Reason for Terminating Plaintiff's Employment

Because Plaintiff has established a prima facie case, the burden shifts to Defendant to articulate a legitimate non-discriminatory reason for its decision to terminate Plaintiff. *McDonnell Douglas*, 411 U.S. at 802 ("The burden then must shift to the employer to articulate some legitimate nondiscriminatory reason for the employee's rejection.").

Defendant has identified a legitimate non-discriminatory reason for terminating Plaintiff. Specifically, Defendant was experiencing profoundly negative financial results as a result of an unusually high rate of denial by payors for services rendered, and as a result needed to restructure its UCM Department. *Turner* v. *NYU Hosps. Ctr.*, 470 F. App'x 20, 22 (2d Cir. 2012) (summary order) (finding that termination of the plaintiff "as part of a hospital-wide effort to reduce all departments' personnel budgets by 2%" was a legitimate justification for the plaintiff's termination); *Walsh* v. *United Cable Techs. Servs. Corp. & Telecomms.*, 201 F.3d 434 (table), 1999 WL 1295333, at *1 (2d Cir. 1999) (summary order) (holding that termination of a plaintiff because of a "division wide reorganization" is a legitimate nondiscriminatory business reason for the defendant's employment action); *see generally Leibowitz* v. *Cornell Univ.*, 584 F.3d 487, 503-04 (2d Cir. 2009) (finding that budgetary concerns are a legitimate nondiscriminatory reason for termination), *superseded on other grounds by* Restoration Act of 2005, N.Y.C. Local L. No. 85; *cf. Malena* v. *Victoria's Secret Direct, LLC*, 886 F. Supp. 2d 349, 359 (S.D.N.Y.

36

2012) ("[T]he company's cost-saving reduction-in-force ... was a legitimate, nondiscriminatory reason for Plaintiff's termination and is sufficient to overcome the presumption of discrimination created by Plaintiff's *prima facie* case.").

Defendant's legitimate non-discriminatory reason is amply supported by the record. By 2011, Defendant was experiencing serious financial difficulties as bills were routinely rejected by payors for services rendered. Pointedly, the UCM Department was incurring a 76% denial of payment rate, weekly denials of up to $350,000, and annual revenue losses of up to $36 million. Upon recognizing these plainly detrimental circumstances, Defendant retained Dr. Leviton to evaluate the situation and remediate the problem. To that end, Dr. Leviton terminated the UCM Director, during which time Plaintiff served as Acting UCM Director, and hired a new UCM Director who had specific knowledge concerning what payors evaluated when approving or denying bills. Ultimately, McPherson decided to terminate Plaintiff because she was not supporting the advancement of that the UCM Department on multiple levels. McPherson then hired, as Plaintiff's replacement, an individual who she determined would support the UCM Department's objective, and who had payor-side audit and compliance experience.

3.    **Plaintiff Has Failed to Identify a Genuine Issue of Material Fact Demonstrating that Defendant's Proffered Non-Discriminatory Reason Is a Pretext for Retaliation**

Defendant has demonstrated a legitimate business justification for terminating Plaintiff; thus, the burden shifts back to Plaintiff to demonstrate that Defendant's explanation is a mere pretext for retaliation.  *McDonnell Douglas*, 411 U.S. at 802.  To meet this burden, the Supreme Court has recently held that a plaintiff bringing a Title VII claim for retaliation must provide proof "that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer."  *Univ. of Tex. Sw. Med. Ctr.* v. *Nassar*, 133 S. Ct. 2517, 2533 (2013); *see also Kwan*, 737 F.3d at 845 ("The Supreme Court recently held that a plaintiff alleging retaliation in violation of Title VII must show that retaliation was a 'but-for' cause of the adverse action, and not simply a 'substantial' or 'motivating' factor in the employer's decision." (quoting *Nassar*, 133 S. Ct. at 2526, 2533)).  In other words, the plaintiff "must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer."  *Nassar*, 133 S. Ct. at 2534.  "Prior to the Supreme Court's decision in *Nassar*, in order to demonstrate pretext, a plaintiff was only required to demonstrate that a retaliatory motive was a 'substantial or motivating factor behind the adverse action.'"  *Kwan*, 737 F.3d at 846 n.5 (quoting *Raniola*, 243 F.3d at 625).[16]

---

[16]    The Second Circuit has declined to address whether the Supreme Court's holding in *Nassar*, which changed the standard for establishing causation in a Title VII retaliation claim, applied to claims under the NYSHRL.  *See Giudice* v. *Red Robin Int'l, Inc.*, 555 F.

38

"A plaintiff may prove that retaliation was a but-for cause of an adverse employment action by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action." *Kwan*, 737 F.3d at 846. "From such discrepancies, a reasonable juror could conclude that the explanations were a pretext for a prohibited reason." *Id.* Importantly, *Kwan* does not hold that a plaintiff can demonstrate pretext simply by showing that the set of proffered explanations was not identical at all times; the majority goes on to find that the plaintiff's supervisor's "testimony *directly contradicts* [the defendant's] main representation to the EEOC." *Id.* (emphasis added); *see also id.* at 847 n.6 (finding that the plaintiff originally offered "a rationale that was disowned by …

---

App'x 67, 69 n.1 (2d Cir. 2014) (summary order) ("The Supreme Court recently clarified that plaintiffs pursuing Title VII claims have to prove at trial that their protected activity was a but-for cause of the alleged adverse action by the employer. We do not address any differences between the standard stated in *Summa* [holding that retaliation claims under Title VII and NYSHRL are analyzed in an identical manner] and the Supreme Court's articulation of the 'but-for' standard in *Nassar* because that distinction is not dispositive of this case." (internal citation and quotation marks omitted)); *Kwan*, 737 F.3d at 847 n.7 ("Because the plaintiff's claims survive under the *Nassar* 'but-for' standard, we do not decide whether the NYSHRL claim is affected by *Nassar*, which by its terms dealt only with retaliation in violation of Title VII.").

District Courts in this Circuit have applied *Nassar* to claims under the NYSHRL. *See, e.g.*, *Taylor* v. *Seamen's Soc. for Children*, No. 12 Civ. 3713 (PAE), 2013 WL 6633166, at *23 (S.D.N.Y. Dec. 17, 2013) ("The 'but for' causation standard from Nassar applies to [the plaintiff's] Title VII and NYSHRL retaliation claim."); *see also Bowen-Hooks* v. *City of New York*, No. 10 Civ. 5947 (MKB), 2014 WL 1330941, at *25 n.25 (E.D.N.Y. Mar. 31, 2014) ("Since the NYSHRL statutory language is the same, and the New York Court of Appeals has consistently stated that federal Title VII standards are applied in interpreting the NYSHRL, this Court will continue to interpret the standard for retaliation under the NYSHRL in a manner consistent with Title VII jurisprudence, as clarified by the Supreme Court in *Nassar*."). This Court will do the same, but makes clear that even applying a "motivating factor" standard, Plaintiff's claim under the NYSHRL would still fail. The record is bereft of evidence that Plaintiff's filing this action impacted Defendant's decision to terminate her employment.

the plaintiff's direct supervisor").  Instead, *Kwan*'s rule regarding pretext is best read as a consistent application of prior Second Circuit law: in order to infer pretext for a retaliatory motive from multiple justifications, a defendant's nonretaliatory justifications must be not merely different, but inconsistent with one another.  *See Ludwig* v. *Rochester Psychiatric Ctr.*, 347 F. App'x 685, 686 (2d Cir. 2009) (summary order) (finding "no inconsistencies in the various articulations offered by the defendants"); *Timothy* v. *Our Lady of Mercy Med. Ctr.*, 233 F. App'x 17, 20 (2d Cir. 2007) (summary order) ("[W]e are not persuaded that a reasonable fact-finder could find any material inconsistency in the proffered explanations.  Indeed, they share a consistent theme ...."); *Roge* v. *NYP Holdings, Inc.*, 257 F.3d 164, 170 (2d Cir. 2001) (finding multiple justifications to be "variations ... on the same theme rather than separate inconsistent justifications").

District courts relying on *Kwan* have thus looked for incompatibility between explanations or evidence to suggest that an initial explanation was fabricated.  *Compare Hahn* v. *Bank of Am. Inc.*, No. 12 Civ. 4151 (DF), 2014 WL 1285421, at *21 (S.D.N.Y. Mar. 31, 2014) (granting summary judgment where "Plaintiff does not point to any weaknesses, implausibilities, inconsistencies, or contradictions in Defendant's proffered reasons for her termination"), *with Ehrlich* v. *N.Y.C. Leadership Acad.*, No. 12 Civ. 2565 (AKH), 2014 WL 2767179, at *7-8 (S.D.N.Y. May 29, 2014) (finding shifting reasons, in combination with evidence suggesting that the defendant's witnesses were "lying," sufficient to

defeat summary judgment); *Balko* v. *Ukrainian Nat. Fed. Credit Union*, No. 13 Civ. 1333 (LAK) (AJP), 2014 WL 1377580, at *21 (S.D.N.Y. Mar. 28, 2014) (denying summary judgment where the defendant "may have falsely manufactured" evidence used to support initial reason for dismissal), *report and recommendation adopted by* No. 13 Civ. 1333 (LAK) (S.D.N.Y. June 10, 2014); *Benussi* v. *UBS Fin. Servs. Inc.*, No. 12 Civ. 1261 (PAC), 2014 WL 558984, at *10 (S.D.N.Y. Feb. 13, 2014) (denying summary judgment upon finding "inconsistencies and contradictions in both [the defendant's] stated reasons for [the plaintiff's] termination and in its account of the timing of the decision").

Plaintiff argues that Defendant has shifted its reason for terminating Plaintiff, and that this purported change in explanation demonstrates that Defendant's business reason for terminating Plaintiff is pretextual.  (Pl. Opp. 21).  In particular, Plaintiff contends that (i) Defendant's termination letter; (ii) McPherson's testimony that her decision to terminate Plaintiff was based, in part, on Plaintiff's sending an inappropriate email in February 2012; (iii) Nhambiu's testimony that he was told by McPherson and Leviton that Plaintiff was terminated "because they were having performance issues with [Plaintiff] that were interfering with the changes" in the UCM Department; and (iv) Defendant's position in support of its pending motion that Plaintiff was terminated because McPherson decided that "she wanted her own Assistant Director to help move the UCM Department forward" present "different

41

explanations for [Plaintiff's] sudden termination." (Pl. Opp. 21-23). To be sure, Defendant offers little argument addressing the multiple reasons given for Plaintiff's termination. However, having carefully reviewed the record, the Court concludes that Plaintiff's contention of inconsistency is belied by the record; each piece of evidence to which Plaintiff points is consistent with Defendant's legitimate business decision to reorganize the UCM Department in order to achieve a lower payor denial rate, and with McPherson's related conclusion that Plaintiff's continued employment as Assistant Director of UCM was inconsistent with that objective.

Plaintiff's termination letter informed Plaintiff that the UCM Department was "undergoing a re-design to improve [its] performance and minimize the number of denials related to medical necessity." (Pl. 56.1 Ex. A). The letter then explained to Plaintiff that in aid of this objective, the Defendant had reviewed "employee roles as determined by department needs," and determined that Plaintiff's services were "no longer required." (*Id.*). The letter thus indicated, albeit delicately, that Plaintiff's services were not supporting the direction the UCM Department was headed, and as such she was being terminated. Neither Defendant's additional justifications nor its subsequent hiring of Valarie Brockington presents an inconsistency with Plaintiff being told that her services were "no longer required," much less an inconsistency sufficient to defeat summary judgment. Rather, Plaintiff's argument is akin to suggesting that telling an ex-partner, "it's not you, it's me," is inconsistent

either with having additional reasons for the breakup or with subsequently dating someone else.  Neither *Nassar* nor *Kwan* requires complete identity of details in each explanation; they simply require that the explanations cohere.

McPherson's and Nhambiu's testimony supported the termination rationale given by Defendant to Plaintiff.  By failing to perform adequately, as deemed by her supervisors, and by engaging in conduct that they found inappropriate, Plaintiff's inclusion in the UCM Department would detract from the Department's objectives.  The same is true for Defendant's identification that McPherson wanted her own Assistant Director.  Indeed, Plaintiff admits as much in her opposition papers by recognizing that the reason that McPherson wanted her own Assistant Director was "to help move the UCM Department forward," and that Nhambiu was informed that Plaintiff was "interfering with changes" in the UCM Department.  (Pl. Opp. 21-22).

McPherson's reference to Plaintiff's February 10, 2012 email similarly fails to contradict the justification that Plaintiff was hindering change in the UCM Department.  McPherson first referenced the email in the context of stating that Plaintiff "was not on path with where we were going and was not supportive." (McPherson Dep. 94).  She was correct.  Plaintiff's email specifically laid out alleged problems with the new Allscripts system (*id.* at 109); McPherson noted early in her deposition that using the system was one of her and Dr. Leviton's priorities when she began her job (*id.* at 29), and further

43

noted toward the end of her deposition that Plaintiff's failure to manage the Allscripts system was a factor in McPherson's decision to fire her (*id.* at 136).

Defendant's termination letter is thus merely a more tactful manner of describing McPherson's and Nhambiu's testimony of the specific issues that Defendant had with Plaintiff that led it to the conclusion that her services were no longer consistent with its efforts to "re-design to improve [its] performance and minimize the number of denials related to medical necessity." (Pl. 56.1 Ex. A).  The reasons put forward by Defendant are properly understood as multiple facets of a consistent rationale, rather than conflicting or contradictory accounts.  Summary judgment is therefore appropriate. *See generally Goins* v. *Bridgeport Hosp.*, 555 F. App'x 70, 74 (2d Cir. 2014) (summary order) (upholding grant of summary judgment in favor of defendants on retaliation claims where plaintiff had "not offered evidence to show pretext or to create a triable issue of material fact as to whether the … termination 'would not have occurred in the absence of the alleged wrongful action or actions of the employer'" (quoting *Nassar*, 133 S. Ct. at 2533)).

Plaintiff's two remaining arguments are equally unavailing.  Plaintiff asserts that pretext is established because Defendant did not follow its own policy.  (Pl. Opp. 24).  As proof, Plaintiff points to the lack of a severance package upon her termination, such as the one Evelyn Brillon received when her position was terminated.  (*Id.* at 25).  But while an employer's departure from established policy may demonstrate discriminatory intent and raise a

44

question of fact for trial, Plaintiff has simply not identified an established policy or procedure from which Defendant departed.  *Cf. Ferrell* v. *Leake & Watts Servs., Inc.*, 83 F. App'x 342 (2d Cir. 2003) (summary order) ("Although the district court determined that the alleged departures from established procedures did not affect the decision to fire plaintiff, whether these departures had an impact upon her dismissal is a question of fact for trial." (internal citation omitted)); *Gallo* v. *Prudential Residential Servs.*, 22 F.3d 1219, 1227 (2d Cir. 1994) (finding sufficient evidence of discriminatory intent where employer's treatment of plaintiff violated its own policy).  Rather, Plaintiff has identified one instance where Defendant decided to provide a severance package to an employee who served in a different, and superior, position to Plaintiff.  This is insufficient to establish a policy, much less a violation of such a policy sufficient to warrant a trial.

Plaintiff further argues that Defendant's decision to replace her with Valarie Brockington evidences that its stated business reason is a pretext because Brockington was not qualified to be Assistant Director.  (Pl. Opp. 26).  "Whether an individual is 'qualified' for a job must be assessed in relation to the criteria the employer has specified for the position, not criteria that seem reasonable to the litigant."  *Sarmiento* v. *Queens Coll.*, 386 F. Supp. 2d 93, 97 (E.D.N.Y. 2005) (footnote omitted).  In the same vein, the court's role "is not to evaluate the wisdom of personnel decisions, but merely to determine whether the decisions were rational and non-discriminatory."  *Id.* at 98; *accord*

45

*Bickerstaff* v. *Vassar Coll.*, 196 F.3d 435, 456 (2d Cir. 1999) ("[The defendant]
alone has the right to set its own criteria for promotion and then to evaluate a
candidate's fitness for promotion under them.  Our role is narrowly limited to
determining whether an illegitimate discriminatory reason played a motivating
role in the employment decision." (internal citation and footnote omitted)).  The
uncontroverted record reveals that Brockington had extensive experience in
hospital management and in payor-side audit and compliance, a Juris
Doctorate, a Bachelor of Science Degree in Nursing, and certifications as a
Case Manager, Litigation Nurse, and Occupational Health Consultant.  (Def.
56.1 ¶ 34 & Ex. BB).  There is nothing in Defendant's hiring of Brockington to
suggest that its proffered reason for the termination of Plaintiff's employment
was pretextual.  *See Idrees* v. *City of New York*, No. 04 Civ. 2197 (LAK) (GWG),
2009 WL 142107, at *14 (S.D.N.Y. Jan. 21, 2009) (report and recommendation)
(recommending grant of summary judgment motion where "[the plaintiff] ha[d]
pointed to no admissible evidence showing that he was similarly situated to
successful candidates for promotion in all material respects or that the stated
reasons for his not getting the promotions were pretextual").

The record makes clear that Defendant's reason for terminating Plaintiff
emanated solely from its business decision to restructure the UCM Department
so as to alleviate its crushing financial problems.  It further makes clear that
this decision, and the consequent restructuring efforts that Defendant
undertook, predated Plaintiff's termination, and occurred during and after

46

Plaintiff's promotion to Acting UCM Director, thereby further negating any
suggestion that Defendant's proffered legitimate reason is a pretext.  Indeed, it
was by October 31, 2011, long before Plaintiff was terminated, that Dr. Leviton
determined that the UCM Department needed new leadership to address its
chronic and costly performance issues and revenue losses.  On this record, no
reasonable juror could conclude that Plaintiff's filing of this action was the but-
for, or even a motivating, factor in Defendant's decision to terminate Plaintiff.

### 3.   Plaintiff's Claim Under the NYCHRL

Plaintiff's claim under the NYCHRL has a less stringent burden at the
final step of the *McDonnell Douglas* framework.  "[A]t the final step the plaintiff
has a lesser burden of raising an issue as to whether the action was motivated
at least in part by discrimination or, stated otherwise, was more likely than not
based in whole or in part on discrimination."  *White*, 2013 WL 5288851, at *12
(internal quotation marks omitted).  For the reasons discussed throughout,
Plaintiff cannot meet this burden.  Defendant has submitted uncontroverted
evidence that its decision to terminate Plaintiff was predicated on its dire need
to overhaul the UCM Department in order to rectify the financial burdens that
it was incurring as a result of the denial rate.  The record evidences that
Plaintiff did not fit within the direction that the UCM Department was moving,
and as a result, her termination was necessary.  Plaintiff has proffered no
evidence to doubt the veracity of Defendant's business rationale for terminating

her employment.  Consequently, Plaintiff's claim for retaliation for her termination under the NYCHRL is dismissed.

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is GRANTED, and Plaintiff's Amended Complaint is dismissed.

The Clerk of Court is directed to terminate Docket Entry 42 and close the case.

SO ORDERED.

Dated:  September 5, 2014
        New York, New York

_____
    KATHERINE POLK FAILLA
    United States District Judge